# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 29, 2013

No. 12-40288

Lyle W. Cayce
Clerk

RYAN CROSTLEY; SHANNON FINLEY

Plaintiffs–Appellants

v.

LAMAR COUNTY, TEXAS; CHRIS BROOKS; STACY MCNEAL; TIMOTHY
KEELE

Defendants–Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before REAVLEY, PRADO, and ELROD, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellants Ryan Crostley and Shannon Finley ("Appellants")
were arrested for the murder of Brandon McClelland after an investigation
conducted by, among others, Defendant–Appellees Stacy McNeal and Chris
Brooks ("Appellees"). Eventually, all charges against Appellants were dropped,
and they filed this civil rights action on January 26, 2010, seeking damages for
injury suffered as a result of their nine-month imprisonment. In addition to
McNeal and Brooks, the original complaint named Lamar County as a
defendant. The district court dismissed all claims against Lamar County with
prejudice on July 21, 2010. After the deadline for joining new parties to the

No. 12-40288

litigation expired, Appellants filed a motion for leave to amend their complaint to add Department of Public Safety (DPS) Officer Timothy Keele as a defendant for the first time, and to add Lamar County as a defendant for a second time. The district court denied this motion. In September 2011 and February 2012 respectively, the district court granted summary judgment for McNeal and Brooks on the basis of their qualified immunity.

Appellants appeal the denial of their motion for leave to amend to add Lamar County and Officer Keele as defendants, as well as the orders granting summary judgment for McNeal and Brooks. We reverse the district court's denial of Appellants' motion for leave to amend as it relates to Lamar County, but affirm the denial as it pertains to Keele. We affirm the district court's orders granting summary judgment for Appellees on Appellants' § 1983 false arrest and state malicious prosecution claims.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

On September 15, 2008, Shannon Finley and Brandon McClelland installed sheet rock together for a man in Paris, Texas. After work, they picked up their friend Ryan Crostley, bought beer, and drove to another friend's house nearby to begin drinking. Once there, all three drank beer and smoked marijuana. At some point in the evening, McClelland and Finley also took Xanax, a central nervous system depressant. Because they could not purchase alcohol in Texas after midnight, at some time in the early morning of September 16, all three left and drove in Finley's Dodge Dakota to Oklahoma to purchase more beer, taking Highway 271.

---

[1] While a number of the basic facts are uncontested, some remain in dispute. Those facts relevant to the appeal of the grant of summary judgment are recounted in the light most favorable to Appellants.

2

No. 12-40288

On their return trip, the group drove slowly and only on back roads because the transmission in Finley's truck was malfunctioning. While they were traveling on one of these country roads, McClelland and Crostley began arguing with Finley about whether he was too intoxicated to drive, and tried to convince him that either McClelland or Crostley should drive instead. When Finley refused, McClelland continued to argue with him. Finley eventually told McClelland that if he preferred not to ride with him, he could get out of the truck. McClelland then exited the truck and Finley and Crostley drove away. After about a mile, Crostley suggested they go back and retrieve McClelland. Finley agreed and turned the truck around. When they found McClelland walking along the side of the road on which they had left him, he again refused to ride with Finley. McClelland took two beers from the truck and continued walking. At some point that night, Crostley vomited in the front seat and out the front passenger window down the side of the truck. Crostley and Finley ultimately returned to Finley's apartment without further interaction with McClelland.

Sometime around 4:20 a.m., McClelland, now walking along FM 2648, was struck and killed by a semi-trailer truck driven by Gary Clark. Clark felt a bump from the right side of his trailer tires, but otherwise had no indication that he had hit anything. Clark continued down the road for about five miles before stopping to see if he had gotten a flat tire. Finding that he had not, he continued to his destination in Idabel, Oklahoma.

Around the time of the accident, Brandon Smith and Clint Frachiseur, two friends driving on FM 2648 in separate cars, passed an eighteen-wheeler coming the opposite direction that was allegedly driving over the speed limit and partly

3

No. 12-40288

over the center dividing line. Moments after passing the truck, they came upon McClelland's body in the road. They then pulled over and called 911. Smith later told authorities that McClelland's body was still emitting steam when they arrived. Two other witnesses also attested to passing a truck similar to Clark's shortly before passing McClelland's body in the road.

DPS Officer Keele, DPS Sergeant James Kain, Lamar County Investigator Joe Tuttle, and Lamar County Sheriff's Deputy Tom Barr were all dispatched to the scene. Tuttle recorded the witnesses' statements. DPS Sergeant Chris Brooks arrived at the accident site sometime close to 5:00 a.m., after the witnesses had left. The officers at the scene noted that McClelland, who weighed 284 pounds at the time of his death, had been severely injured by the impact. He suffered a complete fracture of his pelvis, blunt head trauma so serious that brain matter was found on the highway, and lacerations of his legs approximately thirteen inches above the heel. No debris from any vehicle was found at the accident site.

Later in the morning of September 16, Keele met with members of McClelland's family to deliver the news of his death. McClelland's mother informed Keele that McClelland had been with Crostley and Finley the night before, and gave him their telephone numbers. Keele called Crostley and Finley and asked them to come to the Paris DPS office. When they arrived, Keele obtained a written statement from Finley while another officer simultaneously obtained a statement from Crostley. Both statements contained accounts of the argument between Finley and his passengers, and neither suggested that Crostley and Finley saw McClelland at any point after they drove away the second time. After Crostley and Finley left, Keele called Finley again to ask him

to bring his truck into the DPS office, which Finley did.  At some point before Finley brought in his truck, Finley and Crostley had cleaned the vomit out of the area in front of the front passenger seat, but it is unclear whether this occurred before or after they were first contacted by DPS personnel.  Keele and Kain examined the truck and noticed no significant damage to the truck's body. Photographs of the truck indicate there was no observable damage to the bumper, hood, or windshield.  Keele noted that a part of the truck looked like it had been washed, but not very well.  There was grass, rust, and dirt on the truck's undercarriage.  The truck was released back to Finley after the officers had finished their examination.      The next evening, on September 17, Crostley and Finley were visited by two acquaintances, Trey Laster and Josh Newkirk. Laster had been arrested earlier in 2008 for injuring Finley in a fight.  When they arrived at Finley's apartment, Laster and Newkirk made statements suggesting they were seeking vengeance for McClelland's death and wished to harm Finley and Crostley.  Crostley, as well as an elderly neighbor who could hear the argument, each made 911 calls to report that Laster and Newkirk were trying to kill Finley.

The next day, on September 18, Keele interviewed Lisa Deninfield, the mother of Finley's estranged wife Ashley Finley, who stated that her daughter had information about McClelland's death.  Keele then interviewed Ashley Finley, who said that she had spoken with Newkirk, who said that he had talked to Crostley, and that Crostley had told him he had been in Finley's truck when Finley ran over McClelland and killed him.  Ashley also stated that she had been told Finley had washed his truck at a car wash in Powderly, Texas, after the incident.  That afternoon, either Kain or Keele reviewed videotape from the car

wash Ashley Finley identified, but found no indication in the footage that the car wash had been visited by a Dodge Dakota.

The same day, Billy Pillars, a Paris police officer on patrol at the time, was flagged down by Laster, who said that he had information about the events of the night of September 15–16. Laster stated that Finley had told him about fighting with McClelland and that Finley had admitted to running McClelland over. Laster claimed that the vehicle in question was a Toyota Tundra. Pillars provided an incident report to Brooks, who had been briefed on the investigation that day by Keele.

That evening, on September 18, Ranger Stacy McNeal also began working on the investigation. After he and Brooks were briefed, they went to Crostley's residence and asked him to come into the Paris police station to give another interview. Crostley agreed, and gave an account consistent with his September 16th statement. Keele prepared an affidavit for a search warrant to allow the investigators to search Finley's truck, which was signed by a magistrate later that evening.

On September 20, McNeal and Brooks executed the search warrant after they located Finley's truck in a field on Finley's father's property. They noticed that the carpet on the floorboard was wet and that water was draining from the drain plugs. McNeal and Brooks had the vehicle towed to a garage where they put it on a lift to inspect the undercarriage. Using a Hemastix test, they identified two areas on the truck where the presence of human blood could not be ruled out (the areas tested "presumptively positive" for human blood).[2] The

---

[2] A Hemastix test is used to rule out, but not to verify, the presence of human blood. As a result, it generates many "false positives"—test results that indicate the presence of human blood cannot be definitively eliminated. *See* Hiron Poon et al., *The Use of Hemastix® and the Subsequent Lack of DNA Recovery Using the Promega DNA IQ™ System*, 54 J. Forensic Scis. 1278, 1278 (2009). Such results are apparently especially common when the

samples were sent to the DPS Crime Lab three days later for a conclusive determination of whether human blood was present.

While they were still at Finley's father's residence, McNeal and Brooks interviewed Finley's father, who stated that he had moved Finley's truck to the field because Finley had been receiving threats related to McClelland's death, and Finley's father was concerned that if people saw his truck at the residence, they would believe Finley was also there. Finley's father said that Finley had left Paris to stay with friends in Kansas because he feared for his safety, but that he would willingly return if the authorities needed to talk to him.[3] Finley's father also provided Finley's contact information to Tuttle.

On September 22, McNeal and Brooks interviewed Laster at the Paris Police Department. Laster said that Newkirk had told him that Crostley and Finley had dragged McClelland under Finley's truck and killed him, and that Crostley had said he did not remember very much about the events of that night. Laster also stated that he and Newkirk had gone to Finley's apartment on September 17, where Laster spoke to Finley while Newkirk spoke to Crostley. He said Finley had told him that Finley and Crostley dragged McClelland under the truck for thirty to forty feet and that McClelland's body was "messy," but also that they had not meant to kill him. Laster stated that Finley had told him he washed his truck after the incident. During the interview, the topic of Laster's January 2008 arrest for assaulting Finley was discussed. Brooks and McNeal apparently laughed when Laster mentioned having knocked out Finley's teeth.

---

test is administered in the presence of other organic material. *Id.* By way of comparison, when similar tests were later performed on Gary Clark's truck, over a hundred different areas of the truck tested "presumptively positive" for the presence of blood.

[3] Crostley later confirmed that he and Finley were receiving threats from unidentified members of Paris's black community, who believed McClelland's death to have been racially motivated, before Finley left for Kansas.

No. 12-40288

On September 23, McNeal called Finley's father regarding Finley's whereabouts. Finley's father told him the name of the family friend in Kansas with whom Finley was staying, and that while he could not remember Finley's telephone number, it had been provided to Tuttle.[4] McNeal called Tuttle and successfully obtained Finley's phone number.

The following day, Brooks and McNeal prepared affidavits, sworn by Brooks, for use in obtaining arrest warrants for Finley and Crostley, charging them both with murder and evidence tampering. The affidavits corresponding to each of the four charges were identical, and gave an account of the events of the night of September 15 that largely tracked what Laster had stated in his interview two days before. The affidavits claimed that in his September 16th interview, "Finley advised that he last saw McClelland walking east on FM 2648." They stated that Ashley Finley had told Keele that "Crostley stated that Finley began to 'bump' McClelland with the front bumper of the truck until McClelland fell down" and then Finley ran him over, a statement Ashley Finley never actually made. The affidavits also included the statement:

> On September 18, 2008 affiant traced Shannon Finley to an area outside of Wichita, Kansas. Affiant beliefs [sic] after reviewing reports and statements and speaking with all officers involved in this investigation that Shannon Finley is attempting to elude officers and conceal evidence that maybe [sic] on and or under Finley's vehicle.

Regarding the samples from Finley's truck that were sent to the DPS Crime Lab the day before but had not yet been processed, the affidavits say, "Upon viewing the undercarriage of the truck two separate parts of the truck contained human blood." The affidavits were presented to a justice of the peace, who signed and

---

[4] Finley had dropped his phone in water, and was given his mother's phone as a replacement. Finley's father typically used a speed dial function to call the phone, and so did not have its number memorized.

issued the desired arrest warrants.  Crostley and Finley were arrested shortly thereafter.

McNeal and Brooks continued to collect evidence and conduct interviews. In interviews, Finley and Crostley each repeated their account of the relevant events, which were consistent with their earlier statements.  On September 29, McNeal spoke to residents of the apartment complex where Finley's apartment was located and learned of the threats Laster and Newkirk had made against Crostley and Finley on the night of September 17.  McNeal and Brooks interviewed employees at Wesco Trucking, the company that employed Gary Clark, about a turquoise "truck tractor" that Wesco personnel thought may have run over McClelland.  It was determined that this truck had been out of service on the night McClelland died.  McNeal and Brooks executed a second search warrant for Finley's truck, finding a fiber that ultimately proved to be plant matter, and noting a "water line" on the truck's door.  On October 21, Keele called the medical examiner, gave the examiner the account Laster and Newkirk had provided, and allegedly asked the examiner to change the autopsy report so that McClelland's death was listed as a homicide, rather than an accident.

On December 11, a Lamar County Grand Jury returned an indictment for Finley on counts of murder and evidence tampering, and an indictment for Crostley on counts of murder and retaliation.  They remained incarcerated while the investigation continued and the parties prepared for trial.  In March 2009, McNeal read the statements given by Smith, Frachiseur, and the other two witnesses, and interviewed them for the first time.  In April 2009, defense investigators working on behalf of Crostley and Finley found information that led them to Gary Clark.  On April 19, Gary Clark gave a sworn, videorecorded statement detailing the events of September 16, 2008, in which he said it was likely he had run over McClelland.  McNeal was informed of Clark's statement on April 22, and Clark was then interviewed by the prosecution.  McNeal

interviewed Newkirk again, who now said that Crostley never made any statements to him about the way McClelland was killed, effectively recanting the accusations that had led investigators to arrest Finley and Crostley. When McNeal interviewed Laster again, Laster stated that he could not remember the conversations he had with Finley because he had been drinking heavily on the day he spoke with him. On June 4, all charges against Crostley and Finley were dropped.

Crostley and Finley filed the present suit on January 26, 2010, nearly eight months before the two-year anniversary of their arrest. In the original complaint, they named Lamar County, Brooks, McNeal, and Special Prosecutor Toby Shook as defendants. Invoking 42 U.S.C. § 1983, they sought damages stemming from alleged due process violations (in later pleadings, Fourth Amendment false arrest), false imprisonment, malicious prosecution, and defamation. On July 21, after each Appellee had filed a 12(b)(6) motion to dismiss, the district court granted leave for Appellants to amend their complaint to remedy pleading deficiencies with respect to claims against Brooks, McNeal, and Shook, but dismissed all claims against Lamar County with prejudice and without leave to amend. On August 17, 2010, Appellants filed their first amended complaint, naming the same four defendants in the caption of the complaint, but providing specific arguments only with respect to Brooks, McNeal, and Shook (and not Lamar County). Appellants eventually settled with Shook. Brooks and McNeal each filed motions for summary judgment, asserting qualified immunity. After the deadline to join parties to the litigation had passed, Appellants claimed they had discovered new information about Lamar County's investigation procedures and Keele's role in the case, and so filed a motion for leave to amend so that Lamar County could again be added as a defendant, and Keele could be added as a defendant for the first time.

No. 12-40288

On October 12, the court denied Appellants' motion for leave to add Lamar County and Keele as defendants, deciding, among other things, that amendment would be futile because the statute of limitations had elapsed.  The district court also granted summary judgment for Brooks and McNeal, finding they were both entitled to qualified immunity with respect to the federal false arrest and state malicious prosecution claims, the only claims still at issue.  On November 17, 2011, Appellants filed a motion for reconsideration of their motion for leave to amend, which was also denied.

Appellants now appeal the grant of summary judgment on the false arrest claim in favor of Brooks and McNeal, the grant of summary judgment on the malicious prosecution claim in favor of Brooks, and the denial of their motion for leave to amend.

## II.  DISCUSSION

### A.    Leave to Amend

#### i.    *The District Court's Orders*

On July 21, 2010, as part of an order adjudicating a motion to dismiss filed on behalf of both Lamar County and Brooks, the district court dismissed all § 1983 claims against Lamar County with prejudice.  The court determined that Appellants' complaint had "fail[ed] to sufficiently allege the official policy or custom that inflicted their purported deprivation of constitutional rights," as required for a showing of municipal liability under § 1983.  The court did not grant leave to amend the complaint with respect to the claims against the County.  Nor, importantly, did the district court declare the order an appealable final judgment under Federal Rule of Civil Procedure 54(b).

On June 3, 2011, Appellants filed a motion for leave to amend pursuant to Rule 15(a)(2).  They argued that since the order dismissing their claims against Lamar County issued, they had taken numerous depositions, which had provided new information tending to show that "the Lamar County policies and

11

procedures in place in September[] 2008 were wholly inadequate to handle an investigation like the one in this case." Appellants therefore wished to amend their complaint to bring Lamar County back into the litigation as a defendant. They also claimed that facts relating to Keele's involvement had only come to light during his deposition, which occurred after the deadline to add parties to the litigation, and that they should now be allowed to add Keele as a defendant.

On October 12, 2011, the district court denied Appellants' motion for leave to amend. Because the motion had been filed after the deadline for adding new parties to the suit, the district court first reviewed the motion using Rule 16(b), which "governs amendment of pleadings after a scheduling order deadline has expired." *S&W Enters., L.L.C. v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003); *see also* Fed. R. Civ. P. 16(b)(4). The court determined that because Appellants had shown good cause to modify the scheduling order, it would apply "the more liberal standard of Rule 15(a)" to the decision to grant or deny leave. The court noted that while Rule 15(a) recommends that the court freely give leave to amend when justice so requires, leave may nonetheless be denied for various reasons, including "futility of amendment." *See* Fed. R. Civ. P. 15(a)(2).

According to the court, unless exceptions created by estoppel, equitable tolling, or relation back doctrine applied,[5] claims against both Lamar County and Keele would be futile because the two-year statute of limitations had run as of the time Appellants filed their motion for leave to amend. With respect to Keele, the court found that estoppel did not apply because Keele never misled Appellants about his identity. It also found that the "rare remedy" of equitable tolling was not appropriate because no "extraordinary circumstance" stood in the way of Appellants' timely filing. Relation back doctrine was not applicable,

---

[5] The nature of these exceptions is detailed *infra*, Section II.A.*iv*.

No. 12-40288

because Keele, never previously having been a named defendant, did not receive adequate notice of the possibility of an action against him.[6]

With respect to Lamar County, the court rejected Appellants' argument that because the County had been named in the original complaint, it remained a party to the action. The court determined that equitable tolling, while typically available "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period," was not available in this case. *See Harris v. Boyd Tunica, Inc.*, 628 F.3d 237, 239 (5th Cir. 2010) (noting that equitable tolling applies only in "rare and exceptional circumstances" (quoting *Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002)). The court also determined that relation back doctrine was inapplicable.

Appellants then filed a motion for reconsideration of their motion for leave to amend. They argued in that motion, and argue again on appeal, that Rule 54(b) dictates that Lamar County remained a party to the litigation even after the court dismissed all claims against it, because the court's order was not certified as a final judgment. Without directly addressing this argument, the district court denied Appellants' motion for reconsideration.

*ii.    Standard of Review*

This Court reviews a district court's denial of a motion to amend for abuse of discretion. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). A district court possesses broad discretion in its decision whether to permit amended complaints. *McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1224 (5th Cir. 1987)

---

[6] Rule 15(c)(1) provides:

> An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . .

Fed. R. Civ. P. 15(c)(1)(B).

No. 12-40288

(citing *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d 1157, 1163 (5th Cir. 1982)).

### iii.    Lamar County

Because the district court did not certify as a final judgment its initial order dismissing the claims against Lamar County with prejudice, Lamar County was still a party to the suit at the time Appellants sought leave to amend their complaint.    The district court thus abused its discretion in denying Appellants' motion for leave to amend.

Rule 54(b) provides:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).    In other words, "[n]o ruling can be appealed until a certification is obtained under Rule 54(b) or until all the remaining issues in the case have been decided." 10 Charles Alan Wright et al., *Federal Practice and Procedure* § 2656 (3d ed. 1998) (footnote omitted); *see also Interdrill, Inc. v. Bear Stearns Secs. Corp.*, 214 F.3d 1350, at *1 n.2 (5th Cir. 2000) (per curiam) (unpublished) (finding no appellate jurisdiction where "the district court did not enter a Rule 54(b) judgment on the Rule 12(b)(6) claims," and noting that unless the district court indicates "that no just reason for delay exists and expressly directs entry of judgment, finality will not attach to an order that disposes of some but not all of the defendants" (quoting *Witherspoon v. White*, 111 F.3d 399,

14

402 (5th Cir. 1997))).   The rule reflects the "historic federal policy against piecemeal appeals." *Curtiss–Wright Corp. v. Gen. Electric Co.*, 446 U.S. 1, 8 (1980).   While the Fifth Circuit has done away with the requirement that a district judge "mechanically recite" that there is "no just reason for delay" in order for a judgment to be considered final, *Kelly v. Lee's Old Fashioned Hamburgers, Inc.*, 908 F.2d 1218, 1220 (5th Cir. 1990) (en banc), the district judge's intent to enter a partial final judgment under Rule 54(b) "must be *unmistakable*" on the face of the order or of the documents referenced in it. *Briargrove Shopping Ctr. v. Pilgrim Enters.*, 170 F.3d 536, 539 (5th Cir. 1999).

The district court exhibited no such unmistakable intent in its order dismissing Appellants' claims against Lamar County.   In fact, the order contains no indication *at all* that the district court intended the dismissal to be appealable—there is no use of the word "final" and no mention of Rule 54(b), much less a certification that there was "no just reason for delay."   *Cf. Briargrove Shopping Ctr.*, 170 F.3d at 538, 541 (holding that even though a district court order included the statement, "This is a Final Judgment[,]" the order nonetheless "fail[ed] by a wide margin to meet [the] test [for Rule 54(b) certification]"). This Court would not therefore have had jurisdiction to hear an appeal of the dismissal with prejudice.

No party disputes that Appellants filed their initial complaint against Lamar County before the statute of limitations had run.   *See Price v. City of San Antonio*, 431 F.3d 890, 892 (5th Cir. 2005) (noting that the limitations period for a § 1983 claim is the same as for personal injury actions in the forum state, which in Texas is two years).   Because the district court's dismissal of the claims against Lamar County was not a final judgment, and because the order "adjudicate[d] fewer than all the claims or the rights and liabilities of fewer than all the parties," the dismissal did "not end the action as to [Lamar County] and may be revised at any time before the entry of a judgment adjudicating all the

claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Amending the complaint to again include Lamar County as a defendant therefore would not be "futile," and the district court abused its discretion in so concluding. For these reasons, we reverse the denial of Appellants' motion for leave to amend as it pertains to Lamar County, and remand to the district court. Because we find that the statute of limitations had not elapsed by the time Appellants filed their suit against Lamar County, we need not address whether any of the exceptions to the normal rules of limitations periods (estoppel, equitable tolling, or relation back doctrine) apply with respect to Lamar County.

### iv.    Officer Keele

The district court did not, however, abuse its discretion when it denied Appellants leave to amend their complaint to add Keele to the litigation. The district court correctly noted that relation back under Rule 15(c) can apply to a claim asserted against a new party only if the party "received such notice of the action that [the party] will not be prejudiced in defending on the merits; and . . . knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(i)–(ii). Appellants make no claim that there was ever any confusion as to Keele's identity; indeed, Appellants clearly knew Keele's identity as early as the original pleadings, as he is included in that complaint's factual allegations.

Similarly, estoppel only applies if the party in question misrepresents his identity to the plaintiff, which Keele did not do. *See Hafferman v. Westinghouse Electric Corp.*, 653 F. Supp. 423, 428 (D.D.C. 1986) ("[I]t is well recognized that if a party sought to be added to a complaint misleads a plaintiff *as to its identity*, the new defendant will be estopped from asserting a statute of limitations defense." (emphasis added)).

No. 12-40288

Finally, the district court correctly concluded that application of equitable tolling is not justified in this case. Appellants' having been unaware of certain information before Keele's deposition did not amount to an "extraordinary circumstance" as the doctrine requires. *See Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (explaining that equitable tolling requires a showing "'(1) [a litigant] has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005))). *Cf. Irwin v. Dep't of Veteran Affairs*, , 96 (1990) ("Federal courts have typically extended equitable [tolling] relief only sparingly[:] where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked . . . into allowing the filing deadline to pass." (footnote omitted)). Appellants do not contend that any other exception applies. Therefore, the bar created by the statute of limitations for a claim against Keele means that an amendment adding him as a defendant would indeed be futile. We thus affirm the denial of Appellants' motion for leave to amend as it relates to Keele.

**B.     Appellants' Fourth Amendment Claims and Appellees' Qualified Immunity**

  *i.     Standard of Review*

This Court reviews de novo a district court's grant of summary judgment. *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 149 (5th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is only appropriate where there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Id.* at 247. "Material facts" are those that "might affect the outcome of the suit under the governing law." *Id.* at 248.

*ii.    Analysis*

Qualified immunity protects government officials from liability for civil damages to the extent that their conduct is objectively reasonable in light of clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

To demonstrate the inapplicability of the qualified immunity defense, the plaintiff must satisfy a two-prong test: "First, he must claim that the defendants committed a constitutional violation under current law. Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005) (citations omitted); *see also Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990), *abrogated on other grounds as recognized in Martin v. Thomas*, 973 F.2d 449, 455 (5th Cir. 1992) ("A defendant is entitled to qualified immunity unless, 'on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue . . . .'" (quoting *Malley v Briggs*, 475 U.S. 335, 341 (1986)). The Court may conduct the two-pronged inquiry in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

We begin our analysis with the second prong, and conclude that because Appellees were not "objectively unreasonable" in believing there was probable cause to arrest Crostley and Finley, the district court was correct in granting Appellees' respective motions for summary judgment.[7] This Court determines

---

[7] The claims Appellants have brought against Brooks and McNeal are nearly identical. The determination of each's summary judgment motion turns on whether they were objectively reasonable in believing there was probable cause to arrest Finley and Crostley. McNeal and

whether an officer was objectively unreasonable after taking into account the totality of the circumstances at the time the arrests were made. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007) ("[T]he court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant . . . ."); *United States v. Maslanka*, 501 F.2d 208, 212 (5th Cir. 1974) ("To determine the presence or absence of probable cause to arrest, one must consider the totality of the circumstances surrounding the arrest.").

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions [and] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted). In the context of Fourth Amendment false arrest claims and the issue of probable cause, "[e]ven law enforcement officials who reasonably, but mistakenly, conclude that probable cause is present are entitled to immunity." *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995). Here, Appellants have failed to meet their burden.

Admittedly, much of the evidence Appellees cite in their briefing and in the arrest warrant affidavit as establishing probable cause is of dubious quality. For example, Brooks claims that investigators determined that McClelland had been run over and dragged at a low speed, but this statement appears only in the affidavit Brooks prepared as part of his defense in this suit, and nowhere else in the record. There is little evidence that Crostley and Finley ever traveled on the road on which McClelland was killed, contrary to the claims in the arrest warrant affidavit. While Appellees claim that the undercarriage of Finley's truck had been "washed, cleaned, and driven through tall grass," photographs

Brooks had access to the same information. For these reasons, we analyze their summary judgment motions together.

of the truck taken at the time do not support this conclusion.  Finley did not "flee the state," as Appellees claim, but rather sought refuge with a friend after receiving threats, and then only after he had given his contact information to law enforcement officials.  Appellees were aware that this was the case because of their conversation with Finley's father.

However, the deficiency of any one piece of evidence used to demonstrate probable cause does not, on its own, mean that probable cause did not exist.  *See, e.g.*, *United States v. Privette*, 947 F.2d 1259, 1260 (5th Cir. 1991) ("Because the affidavit supports a finding of probable cause when read without the challenged statements, the trial court did not err in denying [the defendant's] motion to suppress.").  In this case, there was enough evidence suggesting Appellants' culpability that we cannot say Appellees were objectively unreasonable in concluding there was probable cause for their arrest.  Appellants admit that they had been drinking heavily the night of McClelland's death, that the three friends had argued before McClelland exited Finley's truck that night, and that Appellants were the last people to see McClelland alive.  Appellees were told by Ashley Finley and Officer Pillars that Crostley and Finley had admitted to killing McClelland to Newkirk and Laster.  Hearsay statements such as these can be considered as part of the totality of the circumstances in determining if there was probable cause.  *See Illinois v. Gates*, 462 U.S. 213, 239–40 (1983); *United States v. Jackson*, 818 F.2d 345, 348 (5th Cir. 1987); *see also United States v. Fooladi*, 703 F.2d 180, 183 (5th Cir. 1983) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case.").  While Laster and Newkirk later effectively recanted their statements, at the time of Appellants' arrests,

No. 12-40288

Appellees had no reason to disbelieve the witnesses.[8]  Appellees were not objectively unreasonable in concluding that these pieces of evidence, taken together, gave them probable cause to arrest Appellants.  We affirm the district court's grant of summary judgment in favor of Appellees with respect to Appellants' § 1983 false arrest claims.

## C.    Appellants' Malicious Prosecution Claim and Appellees' Official Immunity

Texas recognizes an "official immunity" defense to state law claims such as malicious prosecution.  *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994).  State actors are entitled to official immunity from state law liability for "(1) the performance of discretionary duties (2) that are within the scope of the employees' authority, (3) provided that the employee acts in good faith." *Telthorster v. Tennell*, 92 S.W.3d 457, 460–61 (Tex. 2002); *see also DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 652 (Tex. 1995).  "Texas law of official immunity is substantially the same as federal qualified immunity."  *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997); *see also Hart v. O'Brien*, 127 F.3d 424, 452 (5th Cir. 1997) (holding that where officers "reasonably believed they had probable cause to proceed against [the plaintiff]," as determined in the federal qualified immunity analysis, the plaintiff "cannot assert a claim for malicious prosecution" under Texas law).  Appellees were clearly performing discretionary duties within

---

[8] Appellants note that Appellees were aware that Newkirk had assaulted Finley earlier in the year, and that this meant his statements cannot be credited toward a finding of probable cause because "where the witness has a motivation to lie, or there is some other indication that the information is not reliable," a probable cause affidavit must include evidence demonstrating the witness's veracity. *Hale v. Fish*, 899 F.2d 390, 399 (5th Cir. 1990). *Cf. United States v. Phillips*, 727 F.2d 392, 399–400 (5th Cir. 1984) (finding that wife's reliability was greatly diminished by possible motives for retaliation, as she had recently had a fight with her husband, the defendant).  Leaving aside the issue of whether Newkirk's assault on Finley rises to the level of a "motivation to lie," Appellants point to nothing indicating that *Laster* was an unreliable witness.  Appellees were therefore free to believe Laster's claims that Finley had told him about killing McClelland.

the scope of their authority.  Because we find that Appellees were not objectively unreasonable in believing that probable cause existed, we cannot say they were not acting in good faith over the course of their investigation and arrest of Appellants.  We therefore hold that Appellees are entitled to state official immunity.  The district court was correct in granting their summary judgment motion as to Appellants's state malicious prosecution claim.

## III.  CONCLUSION

For the reasons above, we REVERSE the district court's denial of Appellants' motion for leave to amend as it relates to Lamar County and REMAND for proceedings consistent with this opinion, but AFFIRM the denial as it relates to Keele.  We AFFIRM the district court's orders granting summary judgment for Appellees.