# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 14, 2024

Lyle W. Cayce
Clerk

No. 23-60557

Rodney Rucker,

*Plaintiff—Appellee*,

*versus*

James Marshall; William Carter; Terreous T.J. Johnson,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:22-CV-113

Before Southwick and Duncan, *Circuit Judges*, and Kernodle, *District Judge*.[*]

Stuart Kyle Duncan, *Circuit Judge*:

Officer James Marshall observed Rodney Rucker sitting in the driver's seat of a running car at 3:00 a.m. in front of a hotel known for drugs and prostitution. After learning the car was registered locally, Marshall

---

[*] United States District Judge for the Eastern District of Texas, sitting by designation.

approached to question Rucker, but Rucker repeatedly refused to identify himself or exit the car. After other officers arrived, they broke Rucker's window, took Rucker to the ground, and arrested him. Rucker sued the officers under 42 U.S.C. § 1983 for unlawful seizure and arrest, First Amendment retaliation, excessive force, and bystander liability. The district court denied the officers summary judgment on all claims. The officers now appeal, contending the court erred by failing to grant them qualified immunity. We agree.

Accordingly, we REVERSE the district court's judgment and REMAND for entry of summary judgment in the officers' favor.

## I.

While on patrol around 3:00 a.m. in February 2021, Officer Marshall observed a car in the parking lot of Dreamland Inn with someone in the driver's seat and the engine running. Dreamland is known for drugs, prostitution, and other criminal activity. In 2020 alone, the police department received over 74 citizen complaints concerning Dreamland.

After surveilling for several minutes and seeing no activity, Marshall ran the license plate and learned it was registered to a local address. He watched for another five-and-a-half minutes. Finding the driver's behavior suspicious, Marshall parked behind the car and approached to question the driver. Bodycam footage begins at this point.

After introducing himself, Marshall explained that he had observed Rucker lingering in the car and that this was a "high area . . . for like narcotics, prostitution, and stuff like that." Rucker asked who called him in, and Marshall told him nobody had—he had just noticed Rucker while on patrol. Marshall asked Rucker if he was staying at the hotel. Rucker said he was in room 105 and explained he was warming up the car because it was cold. He

was wearing a t-shirt and continuously rubbed his hands together throughout the encounter. His car was visibly full of clothes, bags, and a bike.

When Marshall asked Rucker for identification, Rucker claimed he did not have his driver's license. Marshall asked if he knew his social security number; Rucker said he did not. Marshall asked for his name and Rucker gave only "Rodney." Marshall asked for his last name and birth date. The following dialogue ensued:

Rucker: "What's the reason?"

Marshall: "I just told you."

Rucker: "…There ain't no reason…."

Marshall: "What we always do, is when we see people sitting in their vehicles, we get out with them, man, and make sure everything is on the up and up."

Rucker: "You know it's cold, right? I'm getting the vehicle ready."

. . .

Marshall: "I get everything you're saying . . . Now I'm just asking you to identify yourself."

Rucker continued to refuse to identify himself.

At this point, Marshall ordered Rucker to exit his car. Rucker refused and rolled up his window. Marshall told Rucker if he didn't open the door Marshall would get him out. Rucker became agitated, rolling his window up and down and yelling that Marshall was "violating me already." Further commands and refusals followed.

During the exchange, Officer Carter arrived. Marshall told him Rucker "still hasn't identified himself, look at the white powder on his nose,

plus he had white powder on his pants." Rucker responded that the white powder "could be anything."

Rucker continued to yell and refused numerous commands from both officers to exit the still running car. Both officers warned him that, if he didn't get out, then things could go badly. Marshall then called for Officer Johnson to come to the scene while Carter stepped away to call Lt. Jenkins.

Carter asked Jenkins whether they had the right to break Rucker's window. Jenkins presumably said they did because Carter then told Marshall that, once Johnson arrived with a baton, they would break the window. The officers believed this was necessary because the car appeared to be locked.

When Johnson arrived, Marshall again ordered Rucker out of the car. Sixteen seconds elapsed during which Johnson warned Rucker this was his last chance. Johnson then broke the window, after which Marshall opened the door and removed Rucker. They took Rucker to the ground, cuffed him, and stood him back up in less than a minute. Marshall repeated that Rucker had white powder on his nose and lap. This time, Rucker responded it was "oil."

The officers searched Rucker and his car, finding no drugs but discovering his driver's license in his front pocket. Marshall arrested Rucker for failure to comply and resisting arrest. Carter took Rucker to the station where he failed a drug test. The test noted Rucker "refused blood and urine sampl[ing]," was "swaying," and had "bloodshot eyes," "white powdery substance in both nasal cavities," and "an orange tongue." Carter added a

No. 23-60557

DUI charge. All charges were dismissed, though, when Marshall did not appear in court because he was sick with COVID.

Rucker filed this suit in June 2022, bringing claims against Officers Marshall, Carter, and Johnson, as well as the City of Senatobia.[1] The district court granted summary judgment to the City but denied it to the officers. Specifically, the court found genuine fact disputes as to: (1) whether Marshall had reasonable suspicion or probable cause to park behind and question Rucker; (2) whether Marshall tried to manufacture justification for Rucker's arrest by mentioning white powder; (3) whether the officers retaliated against Rucker for questioning his detention; and (4) whether Rucker only passively resisted such that the force used to subdue him was excessive. The court performed no analysis of whether the officers' actions violated clearly established law. The officers timely appealed.

## II.

We review the denial of qualified immunity *de novo*. *Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020). While we are generally limited on interlocutory appeal to examining the materiality of fact disputes identified by the district court, *see Joseph v. Bartlett*, 981 F.3d 319, 331 (5th Cir. 2020), we can review genuineness when available video shows a party's account of the facts is false. *Poole v. City of Shreveport*, 13 F.4th 420, 424 (5th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *Curran v. Aleshire*, 800 F.3d 656, 663–64 (5th Cir. 2015)).

---

[1] As noted, Rucker sued the officers under § 1983 for unlawful seizure and arrest, First Amendment retaliation, excessive force, and bystander liability. He sued the City for municipal liability, a claim which is not before us.

No. 23-60557

## III.

To deny qualified immunity, a district court must find "that the alleged conduct amounts to a constitutional violation" and that "the right was clearly established at the time of the conduct." *Buehler v. Dear*, 27 F.4th 969, 980 n.13 (5th Cir. 2022) (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009)). On appeal, the officers argue that the district court failed to view "the facts in the light depicted by the [body cam videos]," *Scott*, 550 U.S. at 381, which plainly showed none of them violated Rucker's constitutional rights. We agree.[2]

## A.

We first consider Rucker's claim that Marshall unlawfully seized him. We agree with Marshall that the body cam videos show beyond dispute that Marshall had reasonable suspicion to stop and question Rucker.

"[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Roper*, 63 F.4th 473, 478 (5th Cir. 2023). Actions "which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *Id.* at 477 (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). Reasonable suspicion is "a low threshold,"

---

[2] The officers also argue that the district court erred by failing to perform a clearly established law analysis. They are correct, *see Buehler*, 27 F.4th at 980 n.13, but we need not base our reversal on that given the district court's error on the first qualified immunity prong.

*United States v. Alvarez*, 40 F.4th 339, 343 (5th Cir. 2022), "considerably less than . . . a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)). An officer is entitled to qualified immunity so long as he is reasonable—even if mistaken—in believing he had the requisite suspicion. *See Heien v. North Carolina*, 574 U.S. 54, 66–67 (2014).

Multiple undisputed facts demonstrate Marshall's reasonable suspicion to approach Rucker. First, Marshall had over seven years of law enforcement experience and had made numerous arrests at Dreamland in his three months working for the Senatobia Police Department. *See United States v. Flowers*, 6 F.4th 651, 656 (5th Cir. 2021) (holding "courts must consider the facts in light of the officer's experience" of 10 years when considering "reasonable suspicion"); *United States v. Hill*, 752 F.3d 1029, 1035 (5th Cir. 2014) (acknowledging officer's testimony that he was present for two arrests at the specific complex presented "relevant contextual considerations in a *Terry* analysis") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

Second, Marshall observed Rucker at this suspicious location at "an unusual hour of the night" after "2:00 a.m., [when] 'the overwhelming majority of law-abiding citizens are at home in bed.'" *Hill*, 752 F.3d at 1036 (quoting *United States v. Michelletti*, 13 F.3d 838, 845 (5th Cir. 1994) (en banc) (DeMoss, J., concurring)). *See also United States v. Byrd*, 113 F. App'x 602, 603 (5th Cir. 2004) (per curiam) (finding reasonable suspicion because the defendant was out at midnight in a high crime area).

Third, Marshall learned that Rucker's plate was registered to a local address. Other courts have found that a local individual staying at a hotel raises suspicion. *See, e.g.*, *United States v. McIntyre*, 384 F. App'x 805, 812 (10th Cir. 2010) (holding officer "reasonably suspected criminal activity

because the vehicle was traveling through the parking lot of a hotel at 2:30 a.m. even though it was registered to an individual with a local address"); *United States v. Garza*, 125 F. App'x 927, 929 (10th Cir. 2005) (finding reasonable suspicion to knock on suspect's hotel room door because she provided a local address, did not have a reservation for the room, and paid in cash).

Finally, Rucker was idling in a running car in a high crime area. We have repeatedly held that idling in such areas contributes to an officer's reasonable suspicion. *See Roper*, 63 F.4th at 478 ("the relevant characteristics of a location can contribute to a finding of reasonable suspicion" (cleaned up)); *United States v. Bass*, 996 F.3d 729, 738 n.1 (5th Cir. 2021) (reasonable suspicion existed "where a vehicle was parked in front of a store with a known history of narcotics-related activity in a high-crime area").

Our decision in *United States v. Flowers*, 6 F.4th 651, is illustrative. There, an officer observed the defendants idling in a car outside a convenience store in a "notoriously crime-ridden neighborhood, at night." *Id.* at 657. Several "officers, all in separate patrol cars, converged upon the [defendants'] vehicle with their blue lights activated" such that "it would have been impossible for the [defendants] to leave the parking lot." *Id.* at 654. We held that the officers had reasonable suspicion to approach the defendants' car in this manner. *Id.* at 653–54.

Rucker responds that *Flowers* is distinguishable because Dreamland is not a high crime area. Under *Flowers*, he claims, such a finding requires "a series of *recent* arrests for violent crimes and burglaries." He posits the 74 calls in 2020 about Dreamland really show only two narcotics reports and a single prostitution report during the prior year. We disagree. Courts generally accept officers' testimony about whether an area is one with a high incidence of criminal activity. *See, e.g.*, *Hill*, 752 F.3d at 1035 (considering

officer's testimony concerning drug arrests as part of "relevant contextual considerations in a *Terry* analysis") (citation omitted).  In *Flowers* itself, we accepted that the area was high crime based on the officer's belief and testimony. *See* Brief for Appellant, *Flowers*, 6 F.4th at *5–6 (No. 20-60056), 2020 WL 3088354; *Flowers*, 6 F.4th at 656.

Finally, we note that—again, according to the video evidence—Marshall's actions subsequent to the initial stop were also reasonable. That is, his encounter with Rucker "last[ed] no longer than [was] necessary" to "dispel his reasonable suspicion" until "further reasonable suspicion, supported by articulable facts, emerge[d]." *Johnson v. Thibodaux City*, 887 F.3d 726, 734 (5th Cir. 2018) (cleaned up).

The initial stop, where Marshall approached Rucker's car and asked him to identify himself, lasted only 35 seconds. These actions were proportionate to the suspicion Marshall had at that point. Rucker's subsequent refusal to identify himself or exit his vehicle legitimately increased Marshall's suspicion. *See Kokesh v. Curlee*, 14 F.4th 382, 395 (5th Cir. 2021) (defendant's failure to identify himself contributed to officer's reasonable suspicion). Furthermore, Rucker's nervously rubbing his hands together throughout the encounter also supported reasonable suspicion. *See United States v. Holmes*, 2022 WL 3335775, at *2 (5th Cir. Aug. 12, 2022) ("Nervous behavior is . . . supportive of a reasonable suspicion."); *United States v. Jefferson*, 89 F.4th 494, 503 (5th Cir. 2023) (suspect's "looking around nervously" and shaking hands contributed to reasonable suspicion).

In sum, contrary to the district court's ruling, the video evidence plainly shows that Marshall had reasonable suspicion to stop and question Rucker. Marshall was therefore entitled to qualified immunity on the unlawful seizure claim.

**B.**

Next we consider Rucker's claim that Marshall unlawfully arrested him. We again agree with Marshall that the arrest was lawful and that, consequently, he is entitled to qualified immunity on this claim also.

"An arrest is unlawful unless it is supported by probable cause." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Levine,* 80 F.3d 129, 132 (5th Cir.1996).

Marshall had probable cause to arrest Rucker for two reasons. First, Mississippi law requires someone "operating a motor vehicle" to display his license "upon demand of a . . . peace officer" or else face "imprisonment in the county jail." Miss. Code Ann. §§ 63-1-41, 69; *see also Lewis v. State*, 831 So. 2d 553, 558 (Miss. Ct. App. 2002) (defining "'operating' the vehicle" as "sitting behind the wheel, in control with the motor running."). Second, Mississippi law requires individuals to obey a police officer's lawful commands—*e.g.*, to identify oneself or exit one's vehicle—where a breach of the peace may otherwise occur, and officers may arrest someone who refuses. *See* Miss. Code Ann. § 97-35-7.

In sum, contrary to the district court's ruling, the undisputed video evidence shows Marshall had probable cause to arrest Rucker. Marshall is therefore entitled to qualified immunity on that claim as well.

**C.**

We next consider Rucker's claim that Marshall arrested him in retaliation for Rucker's exercising his First Amendment rights. Once again, we conclude Marshall is entitled to qualified immunity.

No. 23-60557

Our court has repeatedly explained that a police officer is protected by qualified immunity against a First Amendment retaliatory arrest claim "[i]f probable cause existed . . . or if reasonable police officers could believe probable cause existed."[3] *Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir. 2020) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002)).[4] As discussed, Marshall had probable cause to arrest Rucker under Mississippi law. That means Marshall is protected by qualified immunity as to Rucker's retaliatory arrest claim. The district court erred in concluding otherwise.

## D.

Next, we consider Rucker's claim that Marshall and Johnson used excessive force to arrest him. We agree with the officers that they are entitled to qualified immunity on this claim also.

To establish excessive force, a plaintiff must show "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Byrd v. Cornelius*, 52 F.4th 265, 270 (5th Cir. 2022) (quotations omitted).

---

[3] A "narrow" exception applies when a plaintiff shows other individuals "engaged in the same sort of protected speech" were *not* arrested. *Nieves v. Bartlett*, 587 U.S. 391, 406-07 (2019). Rucker does not argue this exception applies, so we do not consider it.

[4] *See also Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 391–92 (5th Cir. 2017) (referring to First Amendment retaliatory arrest claim, "[o]fficers are . . . entitled to qualified immunity unless there was no actual probable cause for the arrest and the officers were objectively unreasonable in believing there was probable cause for the arrest") (citing *Crostley v. Lamar Cnty.*, 717 F.3d 410, 422–23 (5th Cir. 2013)); *Cooper v. City of La Porte Police Dep't*, 608 F. App'x 195, 199 (5th Cir. 2015)); *Cass v. City of Abilene*, 814 F.3d 721, 730 (5th Cir. 2016) ("In applying the test for qualified immunity [with respect to a retaliatory arrest claim], we explained that '[i]f probable cause existed . . . or if reasonable police officers could believe probable cause existed, they are exonerated.'") (quoting *Keenan*, 290 F.3d at 262).

11

"[O]fficers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).

We have repeatedly held that "noncompliance or continued physical resistance" justifies the use of force.[5] The undisputed facts—again, as plainly shown by the video evidence—fall easily within these precedents. Rucker refused officer commands to get out of his car at least 20 times. The officers then gave him two final warnings before breaking the window sixteen seconds later. Once Rucker was cuffed, the officers ceased all use of force at once. This use of force was objectively reasonable.

In response, Rucker points to *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009), arguing it supports his argument that the officers used excessive force. We disagree. In *Deville*, officers stopped Deville for speeding and ordered her out of the car because she complained about the stop. She refused to exit because her two-year-old granddaughter was in the back seat and her husband was on the way. The officers threatened to call child protective services to take the child, and then broke her window, dragged Deville out, threw her against the car, and cuffed her. *Id.* at 162–64. Deville sustained

---

[5] *See, e.g.*, *Solis v. Serrett*, 31 F.4th 975, 979 (5th Cir. 2022) (no excessive force when, during a minor traffic stop, officers grabbed a belligerent passenger's arms, took her to the ground, cuffed her, and then raised her up); *Priest v. Grazier*, 860 F. App'x 343, 344–45 (5th Cir. 2021) (granting qualified immunity to officers who, after spending two minutes trying to get the plaintiff to lower his window or open his door, broke the window, took him to the pavement, held his face down in broken glass while cuffing him, and struck him three times to get him to stop pulling his hand away); *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009) (no excessive force during minor traffic stop because suspect's resistance to being handcuffed justified "pushing him onto the hood of the cruiser"); *Tennyson v. Villarreal*, 801 F. App'x 295, 296 (5th Cir. 2020) (granting qualified immunity to officers who "had to take [plaintiff] to the ground to handcuff him because of his noncompliance").

serious injuries that required multiple surgeries. *Id.* at 168. We held a jury could find this amounted to excessive force. *Id.* at 169.

This case is quite different. For instance, Rucker was a young man suspiciously lingering in a high crime area in a running car at 3:00 a.m., whereas Deville was a grandmother (with her infant granddaughter in the back seat) pulled over for going 10 miles over the speed limit in broad daylight. *See id.* at 161. Rucker refused to identify himself, whereas Deville produced her registration. *Id.* Rucker was ordered out his car because of the potentially dangerous situation; Deville, only because she voiced displeasure at the stop. *Id.* Rucker had one cut that required a stitch; Deville suffered serious injuries. *Id.* at 168. Thus, *Deville* does not support that the officers used unreasonable force here.[6]

In sum, the video evidence plainly shows the officers did not use excessive force in extracting Rucker from his car and arresting him. The officers are therefore entitled to qualified immunity on this claim.

## E.

Finally, the officers argue that the district court erroneously failed to grant summary judgment dismissing Rucker's bystander liability claim against Carter. We agree. This claim was premised on Rucker's claims for unlawful arrest and excessive force by the other officers. We have already ruled that all of those claims fail and must be dismissed. *See supra* part III.A–

---

[6] Rucker also points to our decisions in *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017), and *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017), but neither helps him. Both involved officers quickly resorting to severe force to subdue subjects who were not given a meaningful chance to comply with the officers' commands. *See Trammell*, 868 F.3d at 342; *Hanks*, 853 F.3d at 746. Rucker was given multiple chances to comply with the officers' orders to exit his running vehicle, but steadfastly refused.

No. 23-60557

D. Accordingly, Rucker's bystander liability claim against Carter necessarily fails as well.[7]

## IV.

The officers are entitled to qualified immunity on all claims. Accordingly, we REVERSE the district court's judgment and REMAND for entry of summary judgment in favor of the officers.

_____

[7] The officers also argue Rucker waived this claim by failing to press it in response to the officers' summary judgment motion. *See Keenan*, 290 F.3d at 262 (explaining that "an issue raised in the complaint but ignored at summary judgment may be deemed waived . . . and cannot be considered or raised on appeal" (cleaned up)). We need not address this point, however, because Rucker's bystander liability claim would fail regardless.