# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 14-11134

———————

United States Court of Appeals
Fifth Circuit

**FILED**

February 24, 2016

Lyle W. Cayce
Clerk

TAMMY CASS, Individually, and as Executor of the Estate of Marcus Cass, Deceased; MATTHEW CASS; JERRY CASS; KYLE CASS; NATHAN CASS,

Plaintiffs – Appellants,

v.

CITY OF ABILENE; CHIEF OF POLICE STAN STANDRIDGE; CHRIS SMITH,

Defendants – Appellees.

———————

Appeal from the United States District Court
for the Northern District of Texas

———————

Before DAVIS, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:

Officer Chris Smith, a detective with the Abilene Police Department (APD), fatally shot Marcus Cass during the execution of a warrant to collect certain business records of Abilene Gold Exchange, where Cass worked. Cass's surviving family members (Appellants) sued the City of Abilene, along with Smith and Chief of Police Stan Standridge in their individual capacities, alleging retaliation in violation of the First Amendment and various Fourth Amendment violations. Appellants appeal the district court's summary judgment order dismissing their excessive force and retaliation claims against Smith and Standridge on the basis of qualified immunity. Because Appellants

No. 14-11134

produced no summary judgment evidence that Standridge was involved with the execution of the warrant or Cass's death, we AFFIRM summary judgment on all claims against him.  Although a reasonable jury could find that the manner in which Smith executed the warrant was unconstitutional and neither the district court nor the parties has addressed whether the violation was clearly established in the law, we AFFIRM summary judgment on Appellants' Fourth Amendment claim as it relates to the execution of the warrant because Appellants have not shown that Smith violated clearly established law.  We AFFIRM summary judgment on Appellants' remaining claims against Smith because Appellants have not raised fact issues to support constitutional claims for retaliation or for excessive force as it relates to Smith's shooting of Cass.

## I.

## A.

Until his death on December 13, 2012, Marcus Cass—together with Charles Camp—managed Abilene Gold Exchange, one of about eight similar businesses in Abilene, Texas that purchased jewelry and precious metals for cash.  Cass and Camp maintained firearms at several easily accessible locations in the store, and signs on the front door warned that the employees were armed.  Although Camp had a thirty-year-old felony conviction for possessing marijuana, Cass had no criminal record and could legally possess firearms.  Abilene Gold Exchange had cooperated with APD in solving past crimes, and on several occasions APD officers had walked into the store and spoken with its employees without incident.

Nevertheless, multiple APD officers testified in depositions that Camp and Cass displayed an "anti-police" attitude, and particularly that they were unhappy with the burden of complying with state and local law requiring reporting of Abilene Gold Exchange's purchases.  Early in 2012, APD began

developing a proposed city ordinance that would require purchasers of precious metals to—among other things—hold purchased items for at least eleven days to give officers time to recover stolen items. A week before Cass's death, the Abilene City Council held a public meeting to discuss the proposed ordinance. Chief of Police Stan Standridge was the primary proponent of the ordinance at the meeting. Cass spoke in opposition to the eleven-day holding requirement, as did Ronald DeLauney, the owner of another gold exchange store. Both Cass and DeLauney emphasized that because the price of gold is highly volatile, an eleven-day holding requirement could have severe consequences when the price dropped after they purchased items. Cass also stated that APD had earlier told him that the ordinance was already in effect, which he found "a little disturbing." DeLauney testified in his declaration that "Chief Standridge became visibly angry during Marcus Cass' testimony." After hearing from Standridge, Cass, DeLauney, and others, the city council narrowly adopted the ordinance with a compromise holding period of seven days.

Five days later, Smith, a detective newly assigned to APD's property crimes unit, called Abilene Gold Exchange as part of his investigation into a recent jewelry theft. Smith testified in his deposition that Camp answered the phone, Smith identified himself and told Camp what he was looking for, including the names of some individuals Smith was investigating, and Camp "was obviously upset, got upset on the phone, [and] started ranting and yelling at [Smith]." Smith testified that this reaction was unusual and made him suspicious, and that when Smith discussed it with his colleagues, they informed him that Abilene Gold Exchange should have been reporting its purchases in Leads Online, an online database used by purchasers of fine

No. 14-11134

metals to satisfy the reporting requirements of the Texas Occupations Code.[1] Smith investigated Abilene Gold Exchange's recent Leads Online reporting and discovered that no new purchases had been entered during the prior three weeks and that some earlier transactions had not been reported within forty-eight hours as required by law.

Based on his research, Smith suspected that Abilene Gold Exchange might be fencing stolen property and that he had probable cause to obtain a warrant for the reporting violations. On December 12, the day after he spoke with Camp, Smith submitted an affidavit to a state district judge and obtained a warrant authorizing him to search Abilene Gold Exchange's physical and electronic records for evidence pertaining to the reporting violations.

The next morning, the property crimes unit met to discuss executing the warrant, as is customary in APD. Although Smith's initial plan had been to simply walk in with another officer and serve the warrant, other officers who "were more familiar with the Gold Exchange" raised concerns about officer safety due to Cass and Camp's "anti-police" attitude, the presence of readily-accessible weapons in the store, and the possibility that Cass and Camp might be "hiding something" that would cause them to shoot police officers.[2] Camp's felony conviction was also discussed as a factor to consider. Lieutenant Gary

---

[1] *See* Tex. Occ. Code § 1956.062(a) ("A dealer shall . . . report all identifiable crafted precious metal that the dealer purchases, takes in trade, accepts for sale on consignment, or accepts for auction."). The Texas Occupations Code requires that the purchaser "deliver" the required information to the chief of police within forty-eight hours, *id.* § 1956.062(d)(2), and APD had approved of purchasers using Leads Online to satisfy this requirement.

[2] Smith testified that he had never met or seen Camp or Cass, and that he had never been to Abilene Gold Exchange; his phone call with Camp the day before was his sole contact with the business. Smith also testified that he was uninvolved with any discussions or planning related to the reporting ordinance, that he was unaware of and did not attend the city council meeting at which Cass opposed the ordinance, and that he did not learn of Cass's opposition to the ordinance until after he had requested the warrant. This testimony is uncontroverted, although Appellants argue that it is not credible.

No. 14-11134

Bone, the head of the Criminal Investigation Division which included the property crimes unit, decided that for the safety of the officers, a team in body armor led by a uniformed officer would enter the business quickly with guns drawn to secure the premises and execute the warrant.

The available officers of the property crimes unit, led by Sergeant Kenneth Robinson and joined by patrol officer Tim Pipes, caravanned to Abilene Gold Exchange and parked down the street, out of sight of the business. Pipes was in his regular police uniform, and the other three officers who would enter the business were wearing street clothes under bullet-proof vests. Smith's vest was solid black; the only indication of his identity as a police officer was his badge, which was attached to his belt on Smith's right side. Smith was also wearing dark sunglasses, which he did not remove upon entering the building. Unlike Smith, the other two officers on the entry team, Chris Collins and Chris Adams, had "POLICE" written in large white letters across their bullet-proof vests. Collins carried an assault rifle and the other officers entered with drawn handguns. Other officers waited at the back of the building.

The raid was captured on Abilene Gold Exchange's three video cameras. Pipes entered first, immediately walking to the counter in the center of the room and pointing his gun toward Camp, who was seated in a small office behind the counter on the officers' right. Smith entered second, walking around the counter along the left-most wall toward a second back office in which Cass was located, to the left of Camp's office from the officers' point of view. Adams and Collins followed Smith. As Smith approached Cass's office, Cass was walking toward the doorway from inside the back room. It appears from the video recording that the officers and Cass could not see each other, but that Cass heard someone enter and was walking to the doorway to greet the person. As Smith walked forward along the wall, his drawn gun, which

5

was extended in front of him, crossed the open doorway and was the first thing Cass saw.  At that point, Cass began to draw his own gun, which was holstered at his right hip.  Smith continued walking forward, and as he came to the doorway, he saw Cass drawing his gun and raising it toward Smith.  Because Smith was not wearing a vest marked "POLICE" and his badge was on his right side opposite Cass, nothing Cass could see indicated that Smith was a police officer; Cass saw only a gunman dressed in black body armor and dark sunglasses.  Smith stepped to the right and fired twice, causing Cass to drop his gun and slump to the floor.  The entire sequence occurred rapidly; Cass was shot about seven seconds after Pipes first set foot in the building.

The videos of the raid do not include audio recording, and the parties dispute what the officers said as they entered.  Smith, Pipes, Adams, and Collins each testified that they personally yelled some variation of "police" and "search warrant."  Officer Cati Shriver, who remained outside until after Cass had been shot, testified that she was "maybe 50 feet" from the door and heard someone yelling loudly "Police, search warrant" just before the two gunshots.  Bill Adams, a bystander, testified in his declaration that he was standing "about 20 to 25 feet from the front door of [Abilene Gold Exchange]" when the raid occurred, and that "I was expecting to hear [the officers] yell 'police' [or] 'search warrant,' but did not hear them yell anything.  A few seconds later, I heard two gunshots."  In a declaration made in connection with his subsequent criminal prosecution, Camp gave the following account:

> On the morning of December 13, 2012, the warrant was executed in a military fashion with all officers entering rapidly and yelling instructions. . . . While the police claimed they yelled "police, search warrant," the only statement heard by Camp as he sat at a desk in an adjoining office was "get your hands up."  Camp never heard anyone yell "police, search warrant."  Camp contends the police were yelling loudly and it was difficult to discern the words they were yelling.

No. 14-11134

It is undisputed that Camp was compliant with the officers' instructions throughout the raid.

After the shooting, the officers quickly secured the premises, handcuffed Cass, and began administering first aid. Paramedics arrived within minutes, but Cass succumbed to his wounds. In the following hours, APD officers obtained separate warrants for Abilene Gold Exchange and the neighboring business, and conducted a thorough search of the premises. Camp was arrested for unlawful possession of a firearm, and was later indicted for not paying approximately $150 in state taxes for purchases made over the internet. Appellants argue that APD has harassed and intimidated parties and witnesses to the shooting in an effort to cover up its misconduct.

Standridge was in San Antonio on the day of Cass's death and there is no summary judgment evidence that he was involved with procuring and executing the warrant or planning the raid.

**B.**

Cass's widow, children, and mother sued the City of Abilene, along with Smith and Standridge in their individual capacities, alleging under 42 U.S.C. § 1983 that: (1) Smith and Standridge retaliated against Cass for speaking out against the proposed ordinance in violation of the First Amendment; and (2) Smith and Standridge used excessive force when they "unlawfully arrested, assaulted, used force against, seized and detained Cass without probable cause, or reasonable suspicion that any violation or crime had been committed" and "Smith's actions in undertaking the unnecessary raid and doing so without announcing his position as a police officer are objectively unreasonable" in violation of the Fourth Amendment.[3] Smith and Standridge moved for

---

[3] Cass's widow, Tammy Cass, as executor of Cass's estate, also brought § 1983 claims against "Defendants" for wrongful seizure of Cass's property under the Fourth and Fourteenth Amendments. These claims were not addressed in the summary judgment

judgment on the pleadings and for summary judgment, arguing that they were entitled to qualified immunity, and also objected to various statements in the evidence proffered by Appellants.

The district court sustained Smith and Standbridge's evidentiary objections and granted their summary judgment motion in full.  The district court determined that Appellants' excessive force claim failed because Smith's use of force was a reasonable response to Cass's drawing his gun on Smith and Standridge was uninvolved in the shooting.  The district court agreed that "the style and manner of executing the search warrant" was not "the wisest plan," but that it was "at best negligent conduct and cannot form the basis of a constitutional violation."  The district court also determined that no genuine issue of material fact existed regarding the officers' announcement that they were police officers.  Finally, the district court rejected Appellants' First Amendment retaliation claim because there was no evidence that Smith was aware of Cass's protected speech when obtaining and executing the warrant and because Standridge, who was aware of the speech, was uninvolved in the decisions relating to the warrant.

In light of its summary judgment ruling, the district court denied as moot Smith and Standridge's motion for judgment on the pleadings and signed a final judgment dismissing with prejudice all claims against Smith and Standridge in their individual capacities.

Appellants appeal the district court's summary judgment ruling.[4]

---

motion or the district court's order, but the district court's final judgment order dismissed "all claims" against Smith and Standridge in their individual capacities.  To the extent that these additional claims were alleged against Smith and Standridge in their individual capacities, Appellants have not appealed their dismissal.  Appellants' claims against the City of Abilene were not part of the district court's summary judgment ruling or final judgment and are not before us on appeal.

[4] Appellants also appeal the district court's exclusion of two statements by Robert DeLauney, another gold buyer who occasionally worked at the Abilene Gold Exchange.  The

No. 14-11134

## II.

## A.

"A grant of summary judgment is reviewed *de novo*, applying the same standard on appeal that is applied by the district court." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014). A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party." *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013). "However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). Furthermore, "when there is video evidence available in the record, the court is not bound to adopt the nonmoving party's version of the facts if it is contradicted by the record, but rather should 'view[] the facts in the light depicted by the videotape.'" *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)), *cert. denied,* 135 S. Ct. 137 (2014).

## B.

Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights. *Trent v. Wade*, 776 F.3d 368, 377 (5th Cir.), *reh'g denied*, 801 F.3d 494 (2015). "A good-faith assertion

---

district court did not abuse its discretion in determining that DeLauney lacked personal knowledge that Camp "never threatened police and always complied with their requests" or that Standridge "was trying to intimidate [Cass and DeLauney]," and in any event, any error was harmless. *See United States v. Tuma*, 738 F.3d 681, 687 (5th Cir. 2013) (review of district court's evidentiary rulings is for abuse of discretion, subject to harmless error analysis).

of qualified immunity alters the usual summary judgment burden of proof," shifting it to the plaintiff to show that the defense is not available. *Trent*, 776 F.3d at 376 (internal quotation marks omitted); *accord McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).

A plaintiff seeking to overcome qualified immunity must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Courts of appeal are free to decide which of the two prongs of the qualified immunity analysis to address first. *Id.*; *see also Camreta v. Greene*, 131 S. Ct. 2020, 2032 (2011) ("[I]t remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials."). The second prong is satisfied only if "the state of the law at the time of the incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks omitted).

### III.

### A.

The district court correctly concluded that Standridge is entitled to qualified immunity on all of Appellants' claims because there is no summary judgment evidence that he was involved in the alleged constitutional violations. The uncontroverted summary judgment evidence is that: (1) Standridge did not direct Smith or any other APD employee to investigate Cass, Camp, or Abilene Gold Exchange or to obtain or execute a warrant on them; (2) Standridge did not participate in the preparation of and request for the warrant and was unaware of the warrant until the morning it was executed; and (3) Standridge was in San Antonio on December 12 and 13, 2012 when APD obtained and executed the warrant, resulting in Cass's death.

Although Appellants argue that this evidence is not credible, they conceded at oral argument that there is no evidence that Standridge knew about or was involved in planning the raid.  This ends our inquiry.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").  With no evidence that Standridge was involved in the acts that allegedly violated Cass's constitutional rights, Standridge cannot be liable under § 1983, and he is therefore entitled to qualified immunity on all of Appellants' claims against him.  *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.") (citing *Rizzo v. Goode*, 96 S. Ct. 598, 604-05, 607 (1976)).

## B.

Appellants' claims against Smith, who personally investigated Abilene Gold Exchange, procured the warrant, and shot Cass, merit closer examination.  As articulated in their briefs and at oral argument, Appellants' three claims are that: (1) Smith retaliated against Cass for speaking out against APD's proposed ordinance in violation of the First Amendment; (2) Smith used excessive force in violation of the Fourth Amendment when he fatally shot Cass; and (3) the unnecessarily forceful execution of the warrant violated Cass's Fourth Amendment rights.

No. 14-11134

**1.**

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). To establish a First Amendment retaliation claim, a plaintiff must show that: (1) he was engaged in constitutionally protected activity; (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were substantially motivated by the constitutionally protected conduct. *Id.*

It is undisputed that Appellants have established the first two elements of their claim against Smith. Cass's public opposition to APD's proposed reporting ordinance was protected speech under the First Amendment. Smith's procurement of a warrant to inspect Abilene Gold Exchange's business records, and the execution of that warrant through a tactical raid with drawn guns would likely deter an ordinary person from further similar speech. Appellants argue that the investigation and raid on Abilene Gold Exchange were substantially motivated by Cass's protected speech at the city council meeting a week before his death. Smith counters that Appellants cannot prove retaliation because the warrant was supported by probable cause and Smith did not make the decision to tactically execute the warrant.

In *Keenan*, we considered "a situation in which law enforcement officers might have a motive to retaliate but there was also a ground to charge criminal conduct against the citizen they disliked," and concluded that "[i]n that situation, the objectives of law enforcement take primacy over the citizen's right to avoid retaliation." *Id.* at 261–62. In applying the test for qualified immunity, we explained that "[i]f probable cause existed . . . or if reasonable police officers could believe probable cause existed, they are exonerated." *Id.*

at 262.  Although *Keenan* involved allegedly retaliatory criminal charges, its standard is readily applicable to Smith's request for a warrant in this case, which also required probable cause.

The evidence is uncontroverted that Smith, in the course of investigating a property theft, discovered that Abilene Gold Exchange had submitted over two dozen entries on Leads Online after the forty-eight hour window allowed by the Texas Occupation Code, and that it had not reported any transactions in the past three weeks, despite having been open for business.  Based on these facts, the state district judge correctly found probable cause to believe that Abilene Gold Exchange had committed a Class B misdemeanor under § 1956.069 of the Texas Occupation Code by not properly reporting its purchases.  Accordingly, under *Keenan*, Smith is entitled to qualified immunity from Appellants' retaliation claim as it relates to obtaining the warrant.

Appellants argue, however, that even if the warrant was based on probable cause, the decision to execute the warrant as a surprise tactical raid with guns drawn was motivated by Cass's protected speech.  It is undisputed that Smith originally intended to serve the warrant with a simple walk-in, and Appellants argue that he changed his mind and decided to execute a raid only after learning of Cass's public opposition to the proposed ordinance, such that "the only logical inference is that Smith's decision to change the execution plan was motivated by . . . his fellow officer's views regarding Cass' comments at the recent City Council meeting."

Appellants' retaliation claim against Smith fails because it is premised on the incorrect assumption that it was "Smith's decision to change the execution plan."  Instead, the officers present at the meeting—including Smith and Bone—uniformly testified that the decision to conduct a raid rather than calmly walk in with the warrant was made by Bone, who as head of the whole Criminal Investigation Division was two levels above Smith in the chain of

No. 14-11134

command.  Appellants offer no contrary evidence.  This is fatal to their claim, because even assuming *arguendo* that the decision was retaliatory,[5] Smith was not the decision-maker, and he cannot be held liable for retaliation on the basis of Bone's decision to execute the warrant with more force than Smith had initially intended.  *See Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007) (holding that even where police officers acted in unison, district court erred in considering their actions together rather than addressing each officer's actions individually for qualified immunity analysis).  Accordingly, Smith is entitled to qualified immunity on Appellants' First Amendment retaliation claim.

**2.**

Appellants argue that Smith's use of deadly force against Cass was excessive under the Fourth Amendment.  The use of deadly force is subject to the Fourth Amendment's reasonableness requirement.  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  "In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears the burden of showing: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable."  *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (citation and internal quotation marks omitted).  "The '[u]se of deadly force is not unreasonable when an officer

---

[5] Smith argues that the change in plans came about after officers who were more familiar with Abilene Gold Exchange than Smith brought up Camp's "anti-police" attitude, his criminal conviction, his unwillingness to cooperate with APD, and most importantly, the presence of easily accessible firearms at the business.  Appellants counter that the presence of firearms was well-known before the morning of the raid, and Camp's felony conviction was for possession of marijuana and was thirty years old.  Appellants also note that two of the officers at the planning meeting the morning of the raid had been at the city council meeting a week earlier when Cass had spoken against the proposed ordinance, and one of them had been the ordinance's primary proponent for over a year.  Because Appellants' claim goes to the decision to change the manner of executing the warrant and Appellants have not sued Bone, the decision-maker, we need not determine whether these facts support a claim of retaliation.

14

No. 14-11134

would have reason to believe the suspect poses a threat of serious harm to the officer or others.'" *Carnaby v. City of Houston*, 636 F.3d 183, 188 (5th Cir. 2011) (quoting *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)); *accord Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The video evidence in this case shows that as Smith crossed the doorway to Cass's office, he saw Cass approaching him and drawing his handgun, at most a few yards from Smith. As Cass continued to raise his gun and pointed it at Smith, Smith fired twice, causing Cass to drop his gun and slump to the floor. The encounter lasted no more than a couple seconds; neither man had time for reflection. As the district court correctly concluded, "[n]o reasonable juror could conclude that at the time of the shooting Defendant Smith did not reasonably perceive a threat to himself and the other officers." Indeed, we have held that officers were entitled to qualified immunity for their use of deadly force when facing less immediate threats. *See, e.g.*, *Ramirez*, 542 F.3d at 128– 31 (reversing denial of summary judgment on qualified immunity grounds where officer shot plaintiff who held gun but did not raise, discharge, or point it at officers).

No. 14-11134

Appellants argue that "[t]he district court erred in allowing the Individual Defendants to create a dangerous, deadly situation and then avoid liability for their acts due to the alleged 'necessity' of having to respond with deadly force to the very situation they created." We agree that by choosing to conduct the raid with surprise and with guns drawn, APD created a dangerous situation that led to Cass's death. Nevertheless, our precedent forecloses consideration of this context in evaluating Appellants' excessive force claim:

> The excessive force inquiry is confined to whether the officer was in danger at the moment of the threat that resulted in the officer's shooting. Therefore, any of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit.

*Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir.) (internal citation, quotation marks, and modifications omitted), *cert. denied*, 135 S. Ct. 137 (2014). Because Smith reasonably believed himself to be in immediate danger when he shot Cass, the shooting did not violate the Fourth Amendment and Smith is entitled to qualified immunity on Appellants' deadly force claim.

**3.**

In a distinct Fourth Amendment excessive force claim, Appellants argue that APD's execution of the warrant was unreasonable, creating a dangerous situation with a high likelihood of serious bodily injury or death. Appellants cite evidence that Abilene Gold Exchange had a history of cooperating with police, none of the officers had ever been threatened by an employee of the business, and the alleged crime upon which the warrant was predicated—failure to properly report purchases of precious metals—was only a Class B misdemeanor. Appellants also argue that a fact issue exists as to whether the police announced themselves upon entry.

Viewing this evidence in the light most favorable to Appellants, a reasonable juror could find APD's use of force, coupled with the failure to

announce, to be objectively unreasonable in violation of the Fourth Amendment.[6] Smith argues that the raid was justified by the presence of guns, Camp's felony conviction, a general sentiment that Camp and Cass had an "anti-police attitude," and the suspicion that Abilene Gold Exchange might be involved in criminal activity more serious than the bookkeeping violations that were the subject of the warrant.    However, neither an unsubstantiated suspicion that crime may be afoot nor a general consensus among officers that business owners have an "anti-police attitude" justifies a surprise tactical raid on a lawful business, particularly one with a history of cooperating with the police.    Nor does the mere presence of guns or a decades-old nonviolent conviction automatically permit the use of force employed here by APD.  *See Gould v. Davis*, 165 F.3d 265, 272 (4th Cir. 1998) (rejecting officers' argument that mere presence of handguns in house justified forceful entry and denying qualified immunity despite officers' having obtained no-knock warrant). Viewing the evidence in the light most favorable to Appellants, various APD officers had entered Abilene Gold Exchange on numerous occasions as part of criminal investigations without ever being threatened, giving APD no reason to expect a violent response.  On these facts, a reasonable juror could find that Smith's use of force violated Cass's Fourth Amendment rights and unnecessarily created a dangerous situation that made Cass's death likely.

However, Appellants also have the burden to show that Smith violated Cass's *clearly established* rights.  Appellants' entire argument on this second prong of the qualified immunity test is that "it is clearly established in the law that citizens are protected against unjustified, excessive police force."  This

---

[6] We are troubled by the unwillingness of the City of Abilene's counsel to concede at oral argument even that there was anything unwise about the raid, which suggests that nothing will be done to prevent a repetition of this tragedy the next time APD needs to inspect the records of a business whose owners are known to be armed.

general statement is insufficient to meet Appellants' burden. *See Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2084 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.") (citations omitted).

We note that the district court did not reach the "clearly established" prong. Moreover, Smith entirely failed to argue that Cass's right was not clearly established, and on an ordinary affirmative defense, Smith would bear the burden of proving the defense. Nevertheless, our precedent dictates that "once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Kovacic v. Villarreal,* 628 F.3d 209, 214 (5th Cir. 2010). We conclude that on this record, Appellants have not shown a violation of clearly established law so as to satisfy this burden.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.