# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 4, 2023

Lyle W. Cayce
Clerk

No. 21-20565

Douglas Petersen, *Individually, and as Administrator of the Estate of Brian Petersen*; Pamela Petersen, *Individually, and as Administrator of the Estate of Brian Petersen*,

*Plaintiffs—Appellants*,

*versus*

Bridgitt Johnson, *EMT*; Wellpath Recovery Solutions, L.L.C.; Southwest Correctional Medical Group, Incorporated; City of Conroe, Texas; Darrick Terrail Dunn,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-4243

---

Before Higginbotham, Haynes, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

Brian Petersen was caught in a sting operation conducted by the Internet Crimes Against Children Task Force for the City of Conroe, Texas. Via a dating app, Petersen agreed to meet up with a 14-year-old boy—who was actually Darrick Dunn, an undercover Task Force detective. After circling the meeting spot for two hours, all the while communicating with

No. 21-20565

Dunn via the dating app, Petersen was arrested and later charged with online solicitation of a minor. He posted bail and was released.

Two days later, Petersen committed suicide by carbon monoxide poisoning. Thereafter, his parents sued numerous defendants in a § 1983 lawsuit alleging claims for false arrest, malicious prosecution, municipal liability, and state law negligence claims. The district court granted the defendants' motions to dismiss. We affirm.

## I.

Dunn is a detective employed by the City of Conroe assigned to the Internet Crimes Against Children Task Force. In July 2019, the Task Force conducted a sting operation to apprehend sexual predators on the prominent dating application "Grindr." As part of the operation, Dunn went undercover using the Grindr profile name "Fresh Meat."

On July 31, Dunn received a message from a profile registered to Petersen, a 39-year-old teacher working in Conroe. The exchange began as follows:[1]

| | |
|---|---|
| Petersen: | How's your week going? |
| | Are you looking for something tonight? |
| | And yes, I can host. |
| Dunn: | You into younger boys |

---

[1] Dunn and the City of Conroe attached the Grindr chat to their motions to dismiss. Generally, "the factual information to which the court addresses its [Rule 12(b)(6)] inquiry is limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). But "[w]hen a defendant attaches documents to its motion that are referred to in the complaint and are central to the plaintiff's claims, the court may also properly consider those documents." *Id.*

No. 21-20565

| | |
|---|---|
| Petersen: | What? |
| | Age? |
| | ? |
| | You there? |
| Dunn: | I'm here.. under 18 |
| Petersen: | There's a lot so wriggle room in that. |
| Dunn: | Lol.. r u into younger boys |
| Petersen: | I'm into guys who are interesting. I'm not particularly into younger guys, but I don't write them off either. |
| Dunn: | [Sends Picture] |
| Petersen: | Lol How old though? |
| Dunn: | Well I'm young just letting you know.. but I'm fun and cool |
| Petersen: | How old? |
| | You look fun and cool. I just need info to make a choice. |
| | ? |
| | I can host. |
| Dunn: | U free tomorrow |
| Petersen: | Maybe. It depends on if you give me information. |
| Dunn: | What information |
| Petersen: | First off, age. |
| | Then maybe a few questions after that. |
| Dunn: | I'm 14 |

After some further back and forth, Dunn told Petersen that he was going to bed.

The next day, August 1, 2019, Dunn and Petersen continued their conversation:

| | |
|---|---|
| Petersen: | What sexual experience do you have? |
| Dunn: | I been with 2 guys before if that's what yur asking |
| Petersen: | Yeah. So you know how to take it? |
| | When are you available and for how long? |
| Dunn: | Of course… I'm free today from 1-10pm… my mom will be working |
| Petersen: | Where would I pick you up? |
| Dunn: | My apartment… where will we go?? |
| Petersen: | My house. |

After tentatively agreeing to meet at 2 p.m., Petersen asked Dunn for a "shirtless pic" and a voice message. Dunn sent a non-shirtless picture of the same individual as before. He also sent a 13-second voice message, to which Petersen responded: "Lol Your voice is not what I was expecting." Petersen declined to send his own picture, explaining that "[t]he age differential makes sending a picture very risky." Dunn expressed hesitancy over the purpose and location of their meeting, to which Petersen responded, "I understand if you want to not meet." Petersen said he "generally only me[]t with guys 25+," and that he was nervous too. Rather than go to his house, Petersen suggested they "talk for a bit. I drop you back off. Then we talk on here to see if we want to continue anything today."

At 2 p.m., Petersen told Dunn to head over to the Sonic Drive-In near Dunn's apartment. Over the next two hours, Petersen detailed his whereabouts:

| | |
|---|---|
| Petersen: | Are you at the entrance of sonic? |
| Dunn: | Not yet. |

No. 21-20565

. . .

Petersen: I will circle once.

Are you close?

Or there?

Starting my circle.

Dunn: Walking there now

Petersen: You are just now starting to walk?

Dunn: I'm out of the apartments

Petersen: Tell me when you're there and I'll start driving back

Dunn: Ok. . and what do I look for, a car.. truck.. van?? [emoji]

Petersen: Almost there

Dunn: Where do I go

Petersen: Entrance to sonic

Side entrance near the apartments

Dunn: Side entrance to what

Petersen: Sonic

Sorry lots of traffic

Dunn: it's hot.. I'm gonna stand inside a restaurant and wait

Petersen: Outside next to the sign. I've been sitting in my car forever. You can stand outside fo[r] a couple minutes

Entrance sign

About to turn. Are you there?

Dunn: I'm at the first financial building across from sonic

No. 21-20565

> Should I walk to sonic??

Petersen:   Yes please

Dunn:      Ok which entrance?

Petersen:   Side near the apartments

Dunn:      Lots of cars here

Petersen:   Go out by where the cars enter and exists [sic]
           next to the street

Dunn:      'This is too much.. what you driving??

           [emoji]

Petersen:   Are you there?

Dunn:      Yes.

According to Dunn's incident report, which was attached to the second amended complaint, "[d]etectives observed a male sitting alone in a silver passenger car across from the Sonic.  The driver drove to the Sonic parking lot and back . . . several times," which "led [detectives] to believe the driver was possibly Petersen."  Dunn and the other detectives stopped the driver, starting the chain of events that precipitated this action.

The second amended complaint alleges that during the stop, "Dunn took, without a search warrant, [Petersen's] phone from him without [Petersen's] permission and accessed the text messages and other information therein."  Dunn's incident report somewhat consistently states: "I got the driver's cellphone and located the 'Grindr' app displayed. The conversation between Petersen and I [sic] was also displayed on the app, which helped us positively identify Petersen as my suspect."

Dunn arrested Petersen and charged him with online solicitation of a minor, a second-degree felony.  Petersen was transported to the Montgomery County jail and booked.  According to the second amended complaint, Petersen experienced "a very high level of anxiety, fear, depression,

hopelessness, thoughts of suicide, and other great mental anguish" immediately following the arrest.

Southwest Correctional Medical Group, Inc. and Wellpath Recovery Solutions, LLC provided contractual mental health and medical care services at the Montgomery County jail. EMT Bridgitt Johnson worked for Southwest and Wellpath at the jail.[2] Upon Petersen's arrival, Johnson screened him and had him fill out a suicide prevention form. No other medical professional evaluated Petersen, and no further care was provided.

Petersen posted bail and was released from custody the next day. He committed suicide two days later. In his suicide note, attached to the second amended complaint, Petersen stated that he believed he "wasn't going to meet a teen," but rather an "adult" engaging in "age play."

On December 14, 2020, Petersen's parents, Douglas and Pamela Petersen, acting individually and as the administrators of Petersen's estate, sued the Wellpath Defendants in the Southern District of Texas. They sought relief under 42 U.S.C. §§ 1983 and 1985, alleging that the Wellpath Defendants violated Petersen's Fourteenth Amendment right to due process. They also sought relief under Texas state law theories of medical negligence and gross negligence.

In February 2021, the Plaintiffs amended their complaint, adding Montgomery County as a defendant. Montgomery County and the Wellpath Defendants filed separate motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court dismissed the Wellpath Defendants but did not rule on Montgomery County's motion. Thereafter, the Plaintiffs filed a second amended complaint, asserting claims against Dunn in his

---

[2] Unless otherwise specifically noted, Southwest, Wellpath, and Johnson are hereafter collectively referenced as the "Wellpath Defendants."

personal capacity and the City of Conroe under §§ 1983 and 1985, and seeking wrongful death damages.  They alleged that Dunn, with the City's oversight and approval, violated the Fourth and Fourteenth Amendments "because of his false arrest, malicious prosecution, and illegal search of [Petersen's] phone."

Dunn, the City of Conroe, and Montgomery County each filed Rule 12(b)(6) motions to dismiss the second amended complaint.  Dunn sought dismissal of "all or, alternatively, part of [the] Plaintiffs' action against him on the ground of qualified immunity."  Otherwise, both Dunn and the City argued that the Plaintiffs' second amended complaint failed to state a plausible claim for relief.  On October 5, 2021, the district court granted the defendants' motions.  The Plaintiffs timely appealed the district court's order, as well the court's prior order dismissing the Wellpath Defendants.[3]

## II.

We review a district court's dismissal under Rule 12(b)(6) de novo. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[3] While Montgomery County is named in the briefs, no section addresses the Plaintiffs' claims against the County.  The Plaintiffs therefore abandoned these claims on appeal, *see United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) (per curiam); they later filed an unopposed motion to dismiss Montgomery County, which this court granted.

No. 21-20565

suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "We may affirm a district court's Rule 12(b)(6) dismissal on any grounds raised below and supported by the record." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

### III.

We first address the Plaintiffs' claims against Dunn and the City of Conroe. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The Plaintiffs assert that they stated plausible claims against Dunn for (A) false arrest and illegal search under the Fourth Amendment and (B) malicious prosecution under the Fourteenth Amendment, and against the City of Conroe for (C) municipal liability. For these alleged violations, the Plaintiffs seek wrongful death damages.[4]

### A.

"Qualified immunity protects government officials" like Dunn "from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam). "A plaintiff seeking to overcome qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Once qualified immunity is raised, "the

---

[4] The Plaintiffs do not appear to have alleged wrongful death as a separate claim, aside from seeking damages on that theory.

burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

The Plaintiffs contend that Dunn is not entitled to qualified immunity because he violated Petersen's clearly established constitutional rights by arresting him without a warrant and without probable cause. But their contention falters because Dunn had probable cause to arrest Petersen and did not violate any clearly established constitutional right in doing so.

In the false arrest context, qualified immunity will apply "if a reasonable officer could have concluded that there was probable cause upon the facts then available to him." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001); *see Club Retro*, 568 F.3d at 204. "Probable cause justifying an arrest 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Actual probable cause is not necessary; merely *arguable* probable cause is sufficient to trigger qualified immunity. *Club Retro*, 568 F.3d at 207 ("[P]laintiffs must allege facts permitting an inference that defendants lacked arguable (that is, reasonable but mistaken) probable cause for the arrests."); *see also D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018). Defeating qualified immunity is thus "a significant hurdle." *Brown*, 243 F.3d at 190. Here, the Plaintiffs ultimately fail to clear it.

Petersen was arrested for online solicitation of a minor in violation of Tex. Penal Code § 33.021(c). Section 33.021(c) provides that:

> A person commits an offense if the person, over the Internet . . . knowingly solicits a minor to meet another person, including the actor, with the intent that the minor will engage

No. 21-20565

in sexual contact, sexual intercourse, or deviate sexual intercourse with the actor or another person.

The statute defines a "minor" as "an individual who is younger than 17 years of age; or an individual whom the actor believes to be younger than 17 years of age." *Id.* § 33.021(a)(1). "[T]he gravamen of the offense . . . is the knowing *solicitation* of a minor to meet a person, with the intent that the minor will engage in some form of sexual contact with that person." *Ex Parte Zavala*, 421 S.W.3d 227, 231–32 (Tex. App.—San Antonio 2013, *pet. ref'd*). Texas courts have held that the crime "is committed, and is completed, at the time of the request, i.e., the solicitation." *Id.* at 232. Accordingly, "[t]he requisite intent arises within the conduct of soliciting the minor, and must exist at the time of the prohibited conduct of solicitation." *Id.*

The operative question is thus whether a reasonable person knowing the facts and circumstances available to Dunn would have believed that Petersen knowingly solicited a person he thought was a minor with the intent that the minor engage in sexual contact with Petersen. The Plaintiffs maintain that the answer is no, for two reasons. First, they contend that no reasonable person would have believed that Petersen thought he was communicating with someone he believed to be under the age of 17. They reassert their complaint allegations that the images Dunn sent of "a so-called '14-year-old'" were "taken many years prior to the text exchange between [Petersen] and Dunn"; that "Dunn left a 13-second voice [message] contain[ing] the voice of an obviously much older man than a 14-year-old"; and that the context of the Grindr exchange clearly showed that Petersen believed he was speaking with "someone engaging in 'age play.'"

The district court rejected this argument, correctly concluding that "Petersen's subjective belief about Dunn's real age is immaterial to the probable cause analysis." That analysis instead turns on the belief of a reasonable person *in Dunn's position*, knowing the facts and circumstances

11

available to Dunn at the time of Petersen's arrest.  And based on the Grindr exchange, a reasonable officer could have believed that Petersen was communicating with someone who Petersen believed was under 17.  Dunn described himself (as the Grindr user "Fresh Meat") as a 14-year-old boy on three separate exchanges with Petersen and indicated that he had just started school at Conroe High.  And Petersen repeatedly made comments consistent with a belief that Dunn was underage.  For example, Petersen stated: "I can't [send a picture].  The age differential makes sending a picture very risky." He also referenced "back to school shopping," and explained that he knew "a lot of people" at Conroe High, including "nephews [Dunn's] age that are involved in a lot."  Contrary to the Plaintiffs' argument, the Grindr chat amply supports a reasonable belief that Petersen thought he was communicating with a 14-year-old boy.

Second, the Plaintiffs assert that "a reasonable person would not believe that [Petersen] was speaking with Dunn with the requisite intent to engage in sexual [contact]."  The record also belies this assertion.  Early in the conversation, after Dunn stated he was 14, Petersen asked "What sexual experience do you have?"  Once Dunn indicated he had "been with 2 guys," Petersen asked, "So you know how to take it?"  Petersen then followed up with "When are you available and for how long?"  They agreed that Petersen would pick Dunn up near "[t]he Park Apartments" and that they would go to Petersen's house.  But as Petersen neared the pickup spot, Dunn indicated he was "nervous."  Petersen said, "I understand if you want to not meet." He then clarified "we won't go to my place. You come to me. We talk for a bit. I drop you back off. Then we talk on here to see if we want to continue anything today."

After Petersen drove near the Sonic "for over an hour," Dunn eventually agreed to meet, saying "we can just talk for a [bi]t."  Petersen then headed to the Sonic, offering to "circle once" while Dunn walked over.

Their conversation continued, with Petersen detailing his location and movements. Petersen messaged Dunn when he arrived, saying he was at the "[s]ide entrance near the apartments" and "[o]utside next to the sign." When Dunn still did not show, Petersen complained that he had "been sitting in [his] car for forever," repeated his location, and gave instructions for finding his car. The detectives stopped Petersen and arrested him near the agreed pickup spot.

The Plaintiffs assert that, given Dunn and Petersen's eventual agreement to meet in public and "just talk," no reasonable person could have concluded that Petersen intended for Dunn to engage in sexual contact. But their assertion fails under Texas law because "[t]he crime of soliciting a minor on the internet under section 33.021(c) is completed at the time of the internet solicitation . . . ." *Ganung v. State*, 502 S.W.3d 825, 829 (Tex. App.—Beaumont 2016, *no pet.*). Because the actor's intent is adjudged at the time of the solicitation, "it does not matter what happens after the solicitation occurs [or] whether the solicited meeting actually occurs." *Id.* (internal quotation marks and citation omitted).

Here, Dunn had probable cause to believe that Petersen committed the offense once Petersen asked Dunn about his availability and the parties tentatively agreed to go to Petersen's house. By that point, the parties had been communicating on an online dating site; Dunn had indicated he was 14; and Petersen had asked about Dunn's sexual experience and whether Dunn "kn[e]w how to take it." Their eventual hesitancy does not matter—the online solicitation had already occurred. *See id.* (explaining the crime occurs at the time of the online solicitation). Given this background, a reasonable officer could have concluded that Petersen asked to meet with the intent to engage in sexual contact with "Fresh Meat." We therefore agree with the district court that—at the very least—arguable probable cause existed to arrest Petersen. The false arrest claim was thus properly dismissed.

No. 21-20565

And this is so regardless of the alleged improper search and seizure of Petersen's phone.  According to the Plaintiffs, "probable cause did not exist for the only crime of which [Petersen] could have been guilty (online solicitation of a minor), thus the seizure" of the phone was "illegal along with the arrest absent probable cause."  The Plaintiffs are incorrect because, as just explained, probable cause already existed for Petersen's arrest irrespective of the phone's seizure.

As for the alleged search of the phone, the Plaintiffs assert that Petersen was only identified as a "possibl[e]" suspect for the crime; Dunn had to search the phone to confirm Petersen's identity.  But this is belied by the same record that substantiates probable cause.  As detailed above, Dunn had more than enough information to identify Petersen, including his play-by-play movements around the agreed rendezvous point, before the putative search occurred.  Any evidence obtained by the search—regardless of its legality—was therefore immaterial to Petersen's arrest.  *See Henderson v. United States*, 405 F.2d 874, 875 (5th Cir. 1968) (per curiam) (describing a situation where probable cause for an arrest existed independently of the fruits of the search at issue).  Moreover, the Plaintiffs failed to allege any injury that resulted from the search apart from the arrest, or request any damages not tied to the arrest itself.  *See Murray v. Earle*, 405 F.3d 278, 290 (5th Cir. 2005) ("Section 1983 does require a showing of proximate causation[.]"); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986) ("[T]he abstract value of a constitutional right may not form the basis for § 1983 damages.").  The district court therefore correctly dismissed the Plaintiffs' illegal search and seizure claims.

## B.

The Plaintiffs' malicious prosecution claim likewise fails.  The Plaintiffs alleged that "Dunn charged [Petersen] with a second-degree felony

14

even though, if Dunn is to be believed about telling [Petersen] he was 14, [Petersen] could only be charged with a third-degree felony." The district court granted dismissal, finding the Plaintiffs failed to state "a cognizable claim."

We agree. The Plaintiffs' interpretation of § 33.021 is based on a misreading of the statute. Petersen was arrested and charged for online solicitation of a minor under § 33.021(c). A violation of subsection (c) is a second-degree felony if, *inter alia*, the offense "involves an individual whom the actor believes to be younger than 17." *See* Tex. Penal Code § 33.021(a), (c), (f). Such was the case here. Petersen was therefore correctly charged, and the Plaintiffs' argument misses the mark. The malicious prosecution claim was properly dismissed.

## C.

Because the Plaintiffs' claims against Dunn fail, their municipal liability claim against the City of Conroe must also fail. Indeed, to establish municipal liability under § 1983, a plaintiff must show a violation of a constitutional right. *See Groden v. City of Dallas, Tex.*, 826 F.3d 280, 283 (5th Cir. 2016) (listing the factors for municipal liability claims). As the Plaintiffs do not do so, the district court did not err in dismissing their municipal liability claim.

## IV.

Lastly, we turn to the Plaintiffs' claims against the Wellpath Defendants. The Plaintiffs sought relief under 42 U.S.C. §§ 1983 and 1985, alleging that the Wellpath Defendants violated Petersen's Fourteenth Amendment right to due process, and under Texas state law theories of medical negligence and gross negligence. These claims lack merit.

To sustain a § 1983 claim against the Wellpath Defendants, the Plaintiffs "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48. The Plaintiffs reason that because Southwest and Wellpath provided contract services for a governmental entity (Montgomery County) and Johnson worked for Southwest and Wellpath, the Plaintiffs have shown that the Wellpath Defendants acted "under color of state law." Even so, the Plaintiffs' § 1983 claims against the Wellpath Defendants must be dismissed because the Wellpath Defendants owed no duty under the Fourteenth Amendment at the time of Petersen's suicide.

The duties owed to a pretrial detainee under the Fourteenth Amendment arise out of the "special relationship" between the state and the detainee. *See McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir. 2002) (per curiam). In other words, the state has a duty to protect a detainee from certain private dangers by virtue of the state's "incarceration, institutionalization, or other similar restraint of personal liberty." *Id.* This "special relationship" has limits—it does not extend beyond the confines of custody. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989) ("[T]he State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the inmate]."); *see also Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc) (holding that the state owes a duty under the Due Process Clause "to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, *during their confinement*" (emphasis added)).

Petersen committed suicide two days after he was released from custody. Because he was no longer in the state's custody, the "special

relationship" had ended, and the Wellpath Defendants owed him no duty of care. *See Walton v. Alexander*, 44 F.3d 1297, 1304 (5th Cir. 1995) (en banc) ("[T]he state creates a 'special relationship' with a person *only* when the person is involuntarily taken into state custody and held against his will through the affirmative power of the state; otherwise, the state has no duty arising under the Constitution to protect its citizens against harm[.]" (emphasis added)); *accord Coscia v. Town of Pembroke, Mass.*, 659 F.3d 37, 39 (1st Cir. 2011) ("[W]e have been apprised of no case recognizing due process liability for suicide based on police conduct except for death during custody."); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 987 (7th Cir. 1998) (plaintiffs cannot maintain that the state had an obligation to stop a pre-trial detainee from committing suicide once he had been released from jail). Consequently, the Plaintiffs cannot state a plausible claim under § 1983, and their §§ 1983 and 1985 claims against the Wellpath Defendants were properly dismissed.

The Plaintiffs' state law negligence claims against the Wellpath Defendants fare no better. "The elements of a medical negligence claim are: (1) a duty to conform to a certain standard of care; (2) a failure to conform to the required standard; (3) actual injury; and (4) a causal connection between the conduct and the injury." *Methodist Hosp. v. German*, 369 S.W.3d 333, 338 (Tex. App.—Houston [1st Dist.] 2011, *pet. denied*). Even assuming the other elements are met, the Plaintiffs' negligence claims stall at causation.

"Proximate cause has two components: (1) foreseeability and (2) cause-in-fact." *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam). "For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e., but for the act or omission—the harm would not have occurred." *Id.* Relevant here, the Supreme Court of Texas has held that a medical provider's "failure to

No. 21-20565

hospitalize a person who later commits suicide is a proximate cause of the suicide only if the suicide probably would not have occurred if the decedent had been hospitalized." *Id.* Nothing alleged in the Plaintiffs' complaint satisfies that high threshold, particularly given the fleeting interaction between Petersen and EMT Johnson, and the interval of time between Petersen's release from custody and his suicide. As with the other claims against the Wellpath Defendants, the district court did not err in dismissing the Plaintiffs' negligence claims.

## V.

To sum up: The district court did not err in granting the defendants' motions to dismiss. The Plaintiffs do not state plausible claims against Dunn or the City of Conroe under §§ 1983 and 1985, as Dunn had probable cause to arrest Petersen and therefore did not violate Petersen's constitutional rights. The Plaintiffs' municipal liability claim against the City of Conroe fails for the same reason. The Wellpath Defendants owed Petersen no duty upon his release from custody, thus defeating the Plaintiffs' §§ 1983 and 1985 claims against them. And finally, Plaintiffs cannot show the requisite causation to sustain their state law negligence claims.

AFFIRMED.